UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action No. 15-31-HRW

STANLEY HALL,                                                           PLAINTIFF,

v.                      **MEMORANDUM OPINION AND ORDER**

AK STEEL CORPORATION,                          DEFENDANT.

This matter is before the Court upon Defendant AK Steel Corporation's Motion for Summary Judgment [Docket No. 33]. The matter has been fully briefed by the parties [Docket Nos. 33-1. 35 and 38]. For the reasons stated herein, the Court finds that Defendant is entitled to judgment as a matter of law.

I.

This case arises from Plaintiff Stanley Hall'semployment5 with Defendant AK Steel Corporation ("AK Steel"). The relevant facts are as follows:

On or around April 6, 1989, AK Steel hired Plaintiff to work at its coke plant. While at the coke plant, Plaintiff held a number of positions including coal handler, laborer, crane operator, engine operator, lidman, storage room clerk, flue tender, machine operator, heating system cleaner, and for a brief time in a "step-up" position. Hall worked in the coke plant for approximately twenty-two years.

He claims that he had minimal problems with his employment until 2010, when Plaintiff alleges that his supervisor, Section Manager Nick Greene, began "targeting" him. Specifically, Plaintiff alleges that Greene disciplined Plaintiff for frivolous reasons and "would write

[Plaintiff] up." Plaintiff claims he was" written-up" for performing work duties in the same way his co-workers performed the same duties. [Docket No. 34-1, Deposition of Stanley Hall, pp. 30-32]. When asked about this allegation, Hall could identify only one specific example. He recalled a time that he and a co-worker, Roger Daniels, received a write-up for not taking temperatures of the ovens at the coke plant. *Id.* at pp. 33-34. Hall could not identify a date and had no documentation of the incident. *Id.* at pp. 38-39. Hall believed the write-up was "frivolous" because he felt the temperature readings were the responsibility of the preceding shift. *Id.* at pp. 38-40. He also believed that Greene "had an issue" with him, but admitted, "[w]hether it was race, I don't know." *Id.* at p. 42. He acknowledged that Greene did not say or do anything to suggest that the write-up was racially motivated, and he further acknowledged that Daniels, who is white, also received a write-up for the incident. *Id.* at pp. 36, 42-43.

Although Hall admitted that he knew of AK Steel's policy for reporting discrimination and harassment to the Human Resources department, he did not report any belief that he was written up because of his race. *Id.* at pp. 43-45, 46-48. Nor did file a grievance with his union to challenge any allegedly "frivolous" write-up at the coke plant. *Id.* at p. 53.

In September 2010, while working the midnight shift at the coke plant, Plaintiff was told by a co-worker, Von Woodson, that someone had written "WHITE POWER" and drawn a swastika symbol at the top of a large piece of equipment at the No. 3 block of the coke plant. *Id.* at pp. 54-55.

Upon hearing about the graffiti, Plaintiff stated over the plant-wide radio channel, "I', not going to deal with this." *Id.* at pp. 55-57. He told his supervisor Michael Marks who informed Plaintiff that it would be taken care of. Plaintiff also reported the incident to his Labor Relations

2

Representative J.P. Bradley. *Id.* at p. 59.

Following Plaintiff's complaint both over the radio and to his supervisor, Michael Marks, Defendant's upper management, including Labor Relations Representative/Manager J.P. Bradley and Human Resources Manager Edna Holbrook, conducted an investigation into the incident and determined Defendant's employee Jimmy Adams had written the graffiti. Soon thereafter, Defendant terminated Mr. Adams' employment. *Id.* at pp. 59-60. Hall Testified that he had no issue with AK Steel's investigation and response to the incident. *Id.* at p. 62-63.

Although in his Amended Complaint, Plaintiff alleges that he was "shocked to see a piece of equipment with a swastika symbol painted on it, with the phrase 'WHITE POWER' written on it," [Docket No. 1, Complaint, ¶ 13], he testified that he did not personally see the writing and further conceded that there is no evidence in the record that a swastika was painted on the equipment. [Docket No. 34-1, Deposition of Stanley Hall, pp. 28-29, 54].

At some point soon thereafter, an unknown individual wrote "BLUE POWER" with a magic marker in the locker room at the coke plant. The graffiti, presumably a substitute for "white power", was written close to Plaintiff's locker. The "blue power" graffiti remained untouched in the locker room for an extended period of time.

In June 2011, AK Steel close the coke plant and Plaintiff, along with several other employees, was transferred to Defendant's "West Works" facility.

In October 2011, Plaintiff's co-worker, Tammy Johnson, brought charges of sexual harassment against Plaintiff. In his deposition, Plaintiff explained that Ms. Johnson was upset about a scheduling issue and became angry at Plaintiff. She began cursing at Plaintiff, and to try to calm her down, Plaintiff tried to give her a hug. Prior to this incident, Plaintiff and Ms.

3

Johnson had been friends for many, many years. *Id.* at p. 78.

AK Steel investigated Johnson's complaint, interviewing approximately fifteen employees, including Hall and Ms. Johnson. Plaintiff told his employer that Ms. Johnson was sexually provocative and said inappropriate things of a sexual nature and that sexual banter among employees was not uncommon in the Warehouse, where both Plaintiff and Ms. Johnson worked. *Id.* at pp. 74-78.

However, other employees corroborated Ms. Johnson's allegations that Hall had engaged in inappropriate conduct of a sexual nature. [Docket No. 33-3, Deposition of J.P. Bradley, pp. 58, 62-65]. Based on its investigation, AK Steel concluded that Hall's conduct violated its harassment and discrimination policy. *Id.* at pp. 27, 62-65. The decision was made to terminate Hall's employment. He was given a five-day subject to discharge letter. However, at the request of the Union, the Company agreed to convert Hall's discharge to a last chance agreement between AK Steel, the Union, and Hall. *Id.* at pp. 27, 59. The Agreement placed Hall on a two year probation and reassigned him from steelmaking to the iron making department. Hall testified that he has no evidence that this Agreement was in any way discriminatory or motivated by race. [Docket No. 34-1, Deposition of Stanley Hall, pp. 84-85]. Indeed, the Agreement saved his job.

The next incident alleged by Plaintiff occurred in early February 2012. On that day, Plaintiff and co-worker Leroy Stevens were called to pressure test the furnace during a shutdown. Ryan Grubb is the foreman in that area. Stevens explained to Foreman Grubb that he was too short to reach the equipment. *Id.* at p. 88. Grubb responded, stating "[d]on't worry about it, that *boy* behind you is tall enough to reach the valves" or some similar statement, addressing

4

Plaintiff as "***boy***." *Id.* at p. 89 (emphasis added). Although Plaintiff did not tell Grubb he was offended by what he perceived to be a racial slur, he testified that he was visibly upset by Grubb's comment and Stevens approached Plaintiff to console him. *Id.* at p. 89. Plaintiff did not report Grubb's comment to management, the Union or Human Resources because he feared retaliation. *Id.*

The next incident alleged by Plaintiff occurred in March 2012. Plaintiff and Andrew Thrower were working in the iron making department on the "highline." *Id.* at p. 92. The highline involves moving railcars back and forth over raw material bins. The rail cars open to drop materials into the bins, which are used to feed the blast furnace. [Docket No. 33-8, Deposition of Ryan Grubb, p. 21].

This particular day was Plaintiff's first day working on the highline as "leader." Thrower was typically the leader because he had worked the highline longer than Plaintiff. Thrower to make Plaintiff the leader that day. [Docket No. 34-1, Deposition of Stanley Hall, p. 93]. Ryan Grubb was the Foreman on duty.

At some point, one of the bins on the highline was empty, which is called a "no flow." Plaintiff went to the control shanty ("booth") to move the cars in order that the "no flow" could be resolved. Grubb came up to the highline and began arguing with Thrower about the "no flow." While Grubb acknowledged that he did not know for certain that Thrower and Plaintiff caused the "no flow," he was upset at them and assumed they were at fault. [Docket No. 33-8, Deposition of Ryan Grubb, pp. 39-41].

According to Plaintiff, Thrower and Foreman Grubb's argument grew heated, but he kept working in the booth. Plaintiff then overheard Grubb say, "[w]ell, I'm writing him up for not

5

being all the way inside that booth." [Docket No. 34-1, Deposition of Stanley Hall, pp. 93-94]. Plaintiff testified that it was a physically impossibility for Plaintiff to fit into the booth and that he was inside the booth as much as he could be. Plaintiff explained this to Foreman Grubb, and also explained to Mr. Grubb that he was on a last chance agreement, and that if Foreman Grubb wrote Plaintiff up, he would be terminated. *Id.* at pp. 93-95.

Grubb testified that only Plaintiff's lower arm was inside the booth. Thrower was not inside a pulpit at all. Grubb subsequently issued write-ups to both Hall and Thrower for violating the safety policy. [Docket No. 33-8, Deposition of Ryan Grubb, p. 43].

Plaintiff was suspended pending investigation of this incident. During the investigation, it was determined that he had violated the written procedure. Because he was under the Last Chance Agreement, this violation resulted in termination of his employment. [Docket No. 44-4, Deposition of J.P. Bradley, p. 83].

The Union filed a grievance to challenge the termination. The grievance went to an arbitration hearing in December 2013. The issue at arbitration was whether or not Plaintiff had violated the written job procedure by not being in the booth and by operating the rail cars while Grubb and Thrower were in the vicinity. The Union argued that, because of Hall's size, it was not possible for him to be completely in the booth. The arbitrator found for the Union and issued a decision in February 2014 vacating the termination and reinstating Hall, with back pay. *Id.*

Pursuant to the arbitration award, Hall was reinstated in March 2014. He was returned to a position at the West Works and received payment for back pay in an amount negotiated by the Company and the Union. *Id.*

Plaintiff alleges additional acts of discrimination occurred after he was back at work.

6

He claims that he was suspended for five days in January 2015 because he could not report to work due to inclement weather, but that other similarly situated employees were not suspended. [Docket No. 18, Amended Complaint, ¶ 25]. When questioned about this allegation during his deposition, Hall did not deny that he was tardy to work. He could also not verify that he was actually disciplined for this particular incident. He agreed that attendance discipline was given to each employee at the end of each calendar quarter based on absentee violations accrued during the quarter. [Docket No.34-1, Deposition of Stanley Hall, pp. 146-147, 149]. He could not verify that the five-day suspension he received in early 2015 was for being late to work because of bad roads. *Id.* Indeed, J.P. Bradley clarified that the five-day suspension was given to Hall at the end of the first quarter of 2015 because of Hall's cumulative absentee violations during the quarter and the active discipline in his record. [Docket No. 33-4, Deposition of J.P. Bradley, pp. 88-89]. Hall's attendance records confirm that he had five absentee violations during the first calendar quarter of 2015.

Hall's Amended Complaint also alleges that he was given a five-day suspension in October 2015 for missing a meeting to solicit United Way pledges and that similarly situated employees who missed the same meeting were not disciplined. [Docket No. 18, ¶ 26]. Howeve4r, during his deposition, Hall did not dispute that he missed the meeting and that it was a safety meeting that all employees were required to attend. [Docket No. 34-1, Deposition of Stanley Hall pp. 140-142]. Hall also acknowledged that discipline for not attending required meetings was progressive, with the level of discipline being based on the amount of cumulative discipline in the employee's record. *Id. at* p. 142.

Bradley confirmed that other employees who missed the same meeting received

discipline. Four employees received five-day suspensions, three employees received three-day suspensions, and others received less, depending upon the levels of active discipline in their records. [Docket No. 33-4, Deposition of J.P. Bradley, pp. 89-9].

Hall filed this lawsuit against AK Steel in the Boyd County Circuit Court on April 20, 2015, asserting that the various disciplinary actions he received from AK Steel over a number of years constituted race discrimination (Count I), a hostile work environment (Count II), and retaliation (Count III) in violation of the Kentucky Civil Rights Act. He also alleges claims for negligent supervision and retention (Count IV), intentional infliction of emotional distress (Count V) and punitive damages.

AK Steel removed the action to this Court and now seeks summary judgment as to all claims alleged herein.

## II.

In 1986, the United States Supreme Court set forth the standard for summary judgment in a trilogy of cases: *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Celotex v. Cartett*, 477 U.S. 317. 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Following this precedent and Fed.R.Civ.P. 56©, the moving party is entitled to judgment as a matter of law when "[t]he pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact." Summary judgment is mandated against a party who has failed to establish an essential element of his or her case after adequate time for discovery. In such a situation, there is no genuine issue of material fact as the failure to prove an essential fact renders

8

all other facts irrelevant. *Celotex v. Cartett*, 477 U.S. at 322-323.

The United States Court of Appeals for the Sixth Circuit has interpreted the United States Supreme Court's trilogy as requiring the nonmoving party to produce enough evidence, after having had a reasonable opportunity to conduct discovery, so as to withstand a directed verdict motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

### III.

The Court will first address Plaintiff's claim under the KCRA for racial discrimination. To establish a discrimination claim under Title VII of the Civil Rights Act of 1964, he must produce either direct or circumstantial evidence in support of his claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004). Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999). If direct evidence of discrimination is produced, then the burden shifts to the employer to show that it would have taken the adverse employment action even in the absence of discrimination. *Id.*

The record does not contain any direct evidence of racial discrimination. Hall admitted as much when he testified that has no information that race played any role in any disciplinary action he received at AK Steel. He repeatedly confirmed that he was unaware of any statements by members of AK Steel management to this effect. [Docket No. 34-1, Deposition of Stanley Hall, pp. 19, 42-42, 130-131, 138, 150-151, 157].

To the extent that Hall relies upon the isolated "that boy" comment by Ryan Grubb in February 2012 as direct evidence of racial discrimination, the United States Supreme Court has recognized that the use of "boy" alone is not always evidence of racial animus. *Ash v. Tyson*

9

*Foods, Inc.*, 546 U.S. 454, 456 (2006). The Sixth Circuit has also held that isolated use of the word "boy" cannot support a claim of race discrimination. In *Worthy v. Michigan Bell Tel. Co.*, 472 Fed.Appx. 342 (6th Cir. 2012), the plaintiff alleged that his supervisor referred to him as "boy" on two occasions. Aside from the fact that the employee was black and the supervisor was white, the court found no evidence that the use of "boy" reflected a racial animus. rather, the court held that the use of "boy" was isolated and not part of a pattern of biased comments. *Worthy,* 472 Fed.Appx. at 347.

Similarly, in *Bowie v. Advanced Ceramics Corp.*, 72 Fed.Appx. 258 (6th Cir. 2003), the Sixth Circuit held that a statement, "[t]hat's too much air, boy," was too isolated in nature to support a claim of race discrimination. *See also Johnson v. Box USA Group, Inc.*, 208 F.Supp.2d 737 (W.D.Ky. 2002) (white supervisor's referring to employee as "boy" on one occasion was not direct evidence of race discrimination).

In this case, Hall has pointed to only one utterance of "boy" by Grubb as evidence of race discrimination. Yet, he cannot demonstrate that the context of the conversation, inflection, tone of voice, or anything else indicated racial animus in the statement. Moreover, this one, isolated comment was not related to any adverse employment action against Hall. As such, the "boy" incident is not direct evidence of racial discrimination.

Absent direct evidence, the Sixth Circuit and Kentucky have adopted the well established *McDonnell Douglas* burden shifting scheme to determine whether a discrimination claim should be submitted to a jury based on circumstantial evidence. *Williams v. Wal–Mart Stores, Inc.*, 184 S.W.3d 492, 495 (Ky.2005) (applying *McDonnell Douglas* to racial discrimination); *Brooks v.*

*Lexington–Fayette Urban Cnty. Hous. Auth.*, 132 S.W.3d 790, 801–02 (Ky.2004) (applying to retaliation). Under this framework, the plaintiff must first establish a prima facie case of race discrimination. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir.2008). A prima facie case for racial discrimination in the employment context requires the plaintiff to prove: "(1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) was replaced by a person outside the protected class or treated differently than similarly situated non-protected employees." *Id.*

Defendant does not appear to contest that Plaintiff satisfies the first element. As to the other elements, the parties disagree. Plaintiff argues that the adverse employment actions fall into four primary groups: (1) the "frivolous" write-ups in 2010 while he was working in the coke plant; (2) his October 2011 discipline for his sexually inappropriate behavior toward Tammy Johnson; (3) his March 2012 discharge; and (4) the various disciplinary actions he received after being reinstated. Yet, in each instance, he fails to address. much less satisfy, the crucial, fourth element. In fact, his deposition testimony as well as other evidence in the record establishes otherwise, that, when warranted, other similarly situated employees were disciplined for the same behavior. With regard to the allegedly frivolous write-ups, for the one instance Plaintiff as able to describe with specifically, he testified that another, white co-worker also received a write up. [Docket No. 34-1, Deposition of Stanley Hall, p. 36]. With regard to the sexual harassment claim, AK Steel's investigation revealed that while other employees used inappropriate language, Plaintiff was the only one who engaged in the specific conduct which formed the basis of the claim against him. As for the March 2012, incident, Thrower, his white co-worker, received an equivalent write-up. With regard to the termination of his employment, it occurred while

11

Plaintiff was employed under the Last Chance Agreement; Thrower was not under a similar agreement. Finally, as for the suspensions following his reinstatement, he offered no evidence of an employee who was similarly situated yet treated more favorably. The lack of proof of disparate treatment is fatal to Plaintiff's claim of racial discrimination.

Even if the record contained credible circumstantial evidence, Plaintiff's claim fails because AK Steel has set forth legitimate, nondiscriminatory reasons for the discipline and discharge of Plaintiff. The deposition testimony of J.P. Bradley provides logical reasons for each adverse employment action. Plaintiff has not challenged this testimony.

Nor has Plaintiff shown that the stated reasons are "mere pretext." *Inwalle v. Reliance Medical Products, Inc.* 515 F.3d 531 (6thy Cir. 2008). To demonstrate pretext, Plaintiff may show that AK Steel's reasons have no basis in fact, were not the actual reasons or that the reasons stated do not sufficiently explain the adverse employment actions. *Id.* at 545. Notably, in his response to Defendant's dispositive motion, Plaintiff does not address pretext at all.

In Count II, Plaintiff brings a hostile work environment claim predicated on racial discrimination.

A plaintiff establishes a prima facie case of racial discrimination based upon a hostile work environment by showing that (1) the plaintiff is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was race-based; (4) the harassment unreasonably interfered with his work performance by creating an environment that was hostile, intimidating or offensive; and (5) the employer was liable for the harassing conduct. *Clay v. United Parcel Service*, 501 F.3d 695, 706 (6th Cir.) To satisfy the fourth element,"unreasonable

interference," a plaintiff "must present evidence showing that under the "totality of the circumstances" the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Id.* Absent direct evidence of racial animus, any proof of race-based harassment must be based on "comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81(1998).

It would appear that Plaintiff relies upon the "white power" graffiti and the "that boy" comment as proof of a hostile work environment. Yet, neither incident, alone or coupled withy The other, reveals an environment so replete with racial animus so as to interfere with Plaintiff's ability to do his job. In considering this claim, a Court examines the frequency and severity of discriminatory conduct.

With respect to the "white power" incident, Plaintiff does not allege that this graffiti was directed at him in any way, either. Further, he admitted that he did not actually see the graffiti. Rather, it was reported to him by a co-worker. Moreover, AK Steel conducted an immediate and, by all accounts, thorough investigation of the incident and disciplined the employee it determined to be responsible for the graffiti. This single incident involving two words not even seen by Plaintiff or directed at him does not satisfy the prima facie requirement of Hall being subject to unlawful harassment.

Similarly, the isolated "that boy" comment by Ryan Grubb does not establish a prima facie claim of hostile work environment. Although Plaintiff perceived it as a racial epithet, he has presented no evidence that it was intended as such by Grubb. Most importantly, this is the

13

only instance identified by Plaintiff of this term being used in his presence in his work environment. As discussed *supra,* a single occurrence of a racial epithet cannot support a hostile work environment claim. *See Johnson v. Box USA Group, Inc.,* 208 F.Supp.2d 737, 743 (W.D.Ky. 2002) (white supervisor's referring to employee as "boy" on one occasion and using the words, "ghetto Kool Aid," in plaintiff's presence was insufficient to support a hostile work environment claim).

As a matter of law, these two isolated incidents do not constitute pervasive or severe harassment to support Plaintiff's claims. His subjective allegations are insufficient to create a genuine issue of material fact as to whether the work environment was racially hostile.

As to AK Steel's liability, there is no evidence that AK Steel tolerated or condoned the conduct relating to the either incident. To the contrary, in response to the graffiti, the AK Steel immediately investigated the incident and terminated the employee whom it determined to be responsible. Plaintiff testified that had no issue with the manner in which AK Steel handled this incident.

Also lacking is evidence that the AK Steel was aware of Grubb's "that boy" remark, much less that it condoned the comment. Plaintiff himself did not report the incident to any member of AK Steel's management, to the Human Resources department, or even to his own Union. Furthermore, when J.P. Bradley later became aware of Grubb's remark, he counseled Grubb about the need to address employees in a more professional manner. [Docket No. 33-4, Deposition of J.P. Bradley, pp. 84-85].

In Count III, Plaintiff that AK Steel retaliated against him because of his complaints to

management.

The *McDonnell Douglas* framework governs claims of retaliation based on circumstantial evidence. To establish a prima facie case of retaliation, Plaintiff must show "(1) that [he] engaged in a protected activity; (2) that the defendant had knowledge of [his] protected conduct; (3) that the defendant took an adverse employment action towards [him]; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

Kentucky courts have adopted the heightened "but for" standard of causation set forth by the U.S. Supreme Court in *Univ. of Texas Southwestern Med. Center v. Nassar*, 133 S.Ct. 2517 (2013). *Asbury Univ. v. Powell*, 486 S.W.3d 246 (Ky. 2016). Plaintiff must prove that, **but for** his allegedly protected activity, he would not have been disciplined.

It is not clear what specific actions that Plaintiff is claiming were retaliation, but has not identified any evidence to establish a causal connection between his alleged protected activity or any subsequent action of AK Steel. During his deposition, he was repeatedly asked to identify evidence linking any discipline to his involvement in the graffiti incident, and he repeatedly responded that he was relying only on his subjective beliefs and personal opinion. However, subjective beliefs are not enough to establish a causal relationship for a retaliation claim, and Plaintiff has offered no evidence that any of the adverse actions would not have been taken "but for" his reaction to learning about the graffiti.

Plaintiff's claims for negligent retention and supervision are flawed as well. First, these claims are not tenable against one's own employer. *See Harris v. Burger King Corp.*, 993

15

F.Supp.2d 677, 692 (W.D. Ky. 2014). Moreover, simply referring to another person as "that boy," which is the sole basis for Hall's claim, does not give rise to tort liability and cannot support any negligent hiring or retention claim.

Plaintiff's final claim is that of international infliction of emotional distress. He alleges that AK Steel acted outrageously toward him by delaying the arbitration of his discharge and when Grubb referred to him as "that boy."

In order to withstand summary judgment, plaintiff to show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Humana of Kentucky, Inc. v. Seitz*, 796 S.W.2d 1, 4 (Ky. 1990). Whether conduct is sufficiently outrageous is initially a question of law. "It is for the court to decide whether the conduct complained of can reasonably be regarded to be so extreme and outrageous as to permit recovery." *Goebel v. Arnett,* 259 S.W.3d 489, 493 (Ky. App. 2007).

In this case, Plaintiff's claims of a delayed arbitration hearing and the use of the word "boy" at that hearing fall far short of this standard. He offers no evidence to refute AK Steel's evidence that Hall's arbitration hearing was delayed by the Union, and not AK Steel. Similarly, Hall's heavy reliance on Grubb's use of the word "boy" takes the term entirely out of context. But even if either of these actions was taken with malicious intent, these actions simply do not "go beyond all possible bounds of decency." Again, the frequency and severity are not present.

IV.

A non-moving party cannot withstand summary judgment by introduction of a "mere scintilla" of evidence in its favor. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). Summary judgment is the time for Plaintiff to, in the memorable parlance of *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) to "put up or shut up."

Plaintiff's response to AK Steel's Motion for Summary Judgment, takes, as Defendant describes it, "a classic 'kitchen sink' approach." The Court agrees. Plaintiff makes generalized assertions, characterizing every perceived slight during the past six years of his employment as "harassment," "discrimination," and/or "retaliation." Glaringly absent from it all is the evidentiary support needed to create an issue of material fact. Plaintiff's subjective beliefs and assumptions, without identifying any admissible evidence, are not sufficient to survive summary judgment.

Accordingly, **IT IS HEREBY ORDERED** that Defendant AK Steel Corporation's Motion for Summary Judgment [Docket No. 33] be **SUSTAINED**.

This 29th day of September, 2017.



Signed By:
*Henry R. Wilhoit, Jr.*
United States District Judge